GREYHOUND LINES, INC., and the Greyhound Corporation, Plaintiffs,

v.

UNITED STATES of America, and Interstate Commerce Commission, Defendants.

Mt. Hood Stages, Inc., d/b/a Pacific Trailways, Public Utility Commissioner of Oregon, and National Trailways Bus System, Intervening Defendants.

No. 69 C 1148.

United States District Court,
N. D. Illinois, E. D.

Feb. 5, 1970.

See also, D.C., 301 F.Supp. 356.

Amos M. Mathews and Robert J. Bernard, Chicago, Ill., for plaintiffs.

Richard W. McLaren, Asst. Atty. Gen., Thomas A. Foran, U. S. Atty., and John H. D. Wigger, Atty., for the United States.

Robert W. Ginnane, Gen. Counsel, and Barry Roberts, Atty., for the Interstate Commerce Commission.

Masuda, Spivack & Funai, Chicago, Ill., Thomas Y. Higashi, Asst. Atty. Gen., Salem, Or., for The Public Utility Comsioner of Oregon.

Eugene L. Cohn, Chicago, Ill., and Donald A. Schafer, Portland, Or., for Mt. Hood Stages, Inc.

Eugene L. Cohn, Chicago, Ill., and James E. Wilson, Bruce E. Mitchell, Washington, D. C., for National Trailways Bus System.

Before KILEY, Circuit Judge, and ROBSON and AUSTIN, District Judges.

## DECISION ON THE MERITS

### PER CURIAM.

This action is brought by Greyhound Lines, Inc. and The Greyhound Corporation (Greyhound) to set aside an order [1] of the Interstate Commerce Commission (ICC) which requires Greyhound to cease and desist from certain practices found to be in violation of representations made to the ICC by Greyhound in earlier approved acquisition proceedings. The ICC in turn has filed a counterclaim seeking

---

[1]. No. MC–F–9136, Mt. Hood Stages, Inc., Petition for Modification—Greyhound Mergers (Western Division), 104 M.C.C. 449 (1968).

to enforce its order, and three companies —Mt. Hood Stages, Inc. (Mt. Hood), National Trailways Bus System, and the Public Utilities Commission of Oregon— have been permitted to intervene pursuant to 28 U.S.C. § 2323. This three-judge court has jurisdiction under 28 U.S.C. §§ 1336 and 2325.[2]

Greyhound is the largest common carrier of passengers by motor vehicle in the United States, authorized to operate throughout most of the country. Mt. Hood, doing business as Pacific Trailways, is a similar carrier authorized to operate in Oregon, Idaho, and Utah. It is affiliated with the National Trailways Bus System, a nonprofit association of bus companies operating throughout the United States who are principal competitors of Greyhound.

From 1947 to 1956, in separate proceedings, before the ICC, Greyhound acquired eight bus companies in the western United States. These acquisitions were approved after hearings by orders of the ICC[3] under Section 5(2) of the Interstate Commerce Act (ICA), 49 U.S.C. § 5(2), and Greyhound was then issued certificates of convenience and necessity as to the acquired routes. Mt. Hood opposed the first and second acquisitions (combined in one order) and the fifth and the sixth. It withdrew its opposition to the fifth proceeding after Greyhound officers represented that Greyhound had no intention of abandoning present through bus connections with Mt. Hood.

Mt. Hood holds a certificate of convenience and necessity for a bus route between Klamath Falls and Biggs (The Dalles), Oregon, which is a north-south route passing roughly through the center of Oregon, a sparsely populated, scenic area of the state. Mt. Hood's remaining certificates (except for special charter certificates not relevant here) are for east-west routes through central Oregon, one of which passes into Idaho, through Boise, to Salt Lake City, Utah. The bus routes acquired by Greyhound in the above proceedings, together with its original routes, completely encircle Mt. Hood, enabling Greyhound to by-pass the north-south route of Mt. Hood through Central Oregon by using its own route along the Oregon coast through Portland. In this way, Greyhound is able to service points in Washington and Montana from California and vice versa without need of Mt. Hood, whose only link to points north and south of Oregon is Greyhound.

From 1949 to 1964, Greyhound and Mt. Hood maintained a through bus agreement cancelable by either party on 60 days' notice. The through bus, on lease to Mt. Hood and driven by its drivers, operated between San Francisco, California, and Spokane, Washington, using the Mt. Hood route between Klamath Falls and Biggs, Oregon. This arrangement had proved profitable to both sides.

2. Additionally, an Expediting Certificate pursuant to Section 44 of the Interstate Commerce Act (49 U.S.C.), has been filed by the Attorney General of the United States, certifying that this case is one of general importance to be expedited under that section.

3. (1) No. MC–F–3102, The Greyhound Corp.—Control; Pacific Greyhound Lines —Control and Merger—O. C. & N. Stages, Inc., 50 M.C.C. 123 (1947), embracing (2) No. MC–F–3208, The Greyhound Corp.—Control—Pacific Greyhound Lines—Control and Merger—M. C. Yahne, Inc., doing business as Inland Stages; (3) No. MC–F–3295, The Greyhound Corp.—Control—Washington Motor Coach Co., Inc., 45 M.C.C. 821 (not printed in full), decided February 3, 1947; (4) No. MC–F–3687, The Greyhound Corp.—Control—North Coast Transportation Co., 55 M.C.C. 801 (not printed in full), decided October 8, 1948; (5) No. MC–F–5190, The Greyhound Corp.—Control and Merger—Interstate Transit Lines, et al., 58 M.C.C. 809 (not printed in full), decided July 30, 1952; (6) No. MC–F–5403, The Greyhound Corp.—Control—Pacific Greyhound Lines —Purchase (Portion)—Oregon Motor Stages, 59 M.C.C. 657 (1953); (7) No. MC–F–5534, The Greyhound Corp.— Purchase—B. C. Motor Transportation, Ltd., 60 M.C.C. 643 (1954), and (8) No. MC–F–5733, The Greyhound Corp.— Merger—Pacific Greyhound Lines; Control—California Parlor Car Tours Co., 70 M.C.C. 59 (1956), hereinafter identified as the acquisition proceedings.

During a strike against Mt. Hood, in 1964, Greyhound instituted a San Francisco to Spokane bus using its own coastal route. After the strike was over, Greyhound canceled the through bus agreement with 60 days' notice and permanently rerouted its San Francisco-Spokane bus along the wholly Greyhound route through Portland. This lengthened the San Francisco-Spokane trip by 110 miles and several hours, and has created a situation in which Mt. Hood's shorter and faster central route, now wholly dependent on Greyhound connecting buses at Klamath Falls and Biggs, Oregon, has fallen dramatically in popularity.

Mt. Hood then brought a petition before the ICC on October 7, 1964, for reconsideration of the seven prior acquisition orders. It sought a supplemental order under Section 5(9) of the ICA, 49 U.S.C., "specifically enforcing the promises, representations, and assurances relied upon by the commission in approving the said acquisitions." Section 5(9) provides:

> "The Commission may from time to time, for good cause shown, make such orders, supplemental to any order made under paragraph * * * (2), * * * as it may deem necessary or appropriate."

Mt. Hood argued that Greyhound had achieved a planned encirclement of Mt. Hood to put it out of business or to force a sale to Greyhound. It urged that approval by the ICC of Greyhound's acquisitions was induced or furthered by representations of Greyhound, of record in those proceedings, that it would not disturb existing traffic patterns or adversely affect existing carriers, that it was not Greyhound policy to route passengers circuitously over its lines, that Greyhound agents were instructed to sell via the most direct route even if it was over

a competing line, that Greyhound would continue to show Mt. Hood's schedules in its folders and that the through bus would be continued. To show that Greyhound had violated those representations, Mt. Hood introduced evidence that the through bus had been discontinued unreasonably, that since its discontinuance Greyhound had arranged its north and south connecting schedules so as to destroy the advantages of Mt. Hood's route (i. e., by creating long layovers at points on the Klamath Falls route and by eliminating local stops on its own Portland route to equalize time differentials), that Greyhound agents would not voluntarily quote shorter or cheaper Mt. Hood routes to prospective passengers and when asked would quote them inaccurately, that Greyhound had ceased showing Mt. Hood routes on its schedules while it continued to show those of other competitors, and that Greyhound indulged in other similar practices designed to stifle Mt. Hood as a competitor.[4]

The trial examiner agreed with Mt. Hood that Greyhound had made specific representations in prior acquisition proceedings, which generally amounted to assurances of public benefit and interest and no harm to existing carriers or service. He further found that Greyhound was and is engaging in practices unreasonable and inconsistent with the above representations, principally (1) the discontinuance of the through bus, (2) the revision of schedules with long layovers at Mt. Hood connecting points, and (3) the involuntary and inaccurate quoting of joint through rates by Greyhound agents. The examiner recommended the issuance of a supplemental order under Section 5(9), which he found "fits the bill."

On review by Division Three of the ICC, the examiner's findings concerning representations that were made and prac-

---

4. Other practices of Greyhound alleged by Mt. Hood were that Greyhound discriminated against Mt. Hood at Greyhound depots occupied by both carriers, that it requested Mt. Hood representatives to discontinue calling on Greyhound agents, that it influenced joint commission agents selling both Greyhound and Mt. Hood tickets to favor Greyhound, and that it refused to establish joint through fares.

tices that violated them were affirmed. The commissioners particularly found that statements made at the fifth proceeding amounted to a commitment not to disrupt traffic patterns unreasonably without regard to the effect on Mt. Hood. They found that "the only reasonable inference that can be drawn from the record is that the cancellation of the through bus and revision of time schedules were inspired by a desire to stifle competition." 104 M.C.C. at 461. It was further stated that the failure of Greyhound to abide by its commitments without sound reason constituted destructive competition in contravention of the national transportation policy. The Division held that Section 5(9) authorized the entry of a supplemental order, but no specific order was entered, since the commissioners decided to give Greyhound time voluntarily to conform its practices to its representations.

Greyhound did not voluntarily conform. Thus on petition for reconsideration by Greyhound, the entire Commission specifically ordered Greyhound

"to cease and desist forthwith, and thereafter to refrain and abstain, from all practices of the character found in the prior reports of Division 3 and the hearing examiner to be unreasonable and inconsistent with respondent's representations in the above-entitled proceedings, as of the date of hearing in No. MC–F–5190, The Greyhound Corp.—Control and Merger—Interstate Transit Lines, et al., 58 M.C.C. 809 (not printed in full), decided July 30, 1952, and to restore practices and traffic patterns, existing or in contemplation as of that date, which have resulted in (1) principally, (a) the discontinuance of the San Francisco, Calif.-Spokane, Wash., through bus service via Klamath Falls, and Briggs (sic) (The Dalles), (b) the revision of schedules with long layovers at those and other intermediate points, and (c) its agents' failure to quote voluntarily, and often accurately or responsive to prospective passengers joint through routes and fares, and (2) such other

discriminatory and destructive practices which foreclose competitive and traffic patterns unreasonably or unnecessarily, without regard for adverse effects on Mt. Hood, doing business as Pacific Trailways."

A further petition for reconsideration was denied by the ICC on April 14, 1969, making the order final and ripe for review.

I. *ICC Power Under Section 5(9).*

■ Greyhound first argues that the ICC did not have the power under Section 5(9) to reopen the acquisition proceedings or enter its order. Specifically, it argues that the action taken by the ICC was essentially a partial revocation or suspension of Greyhound's certificates of convenience and necessity for which the exclusive administrative procedure is Section 212(a) of the ICA, 49 U.S.C. § 312(a), and that Section 5(9) cannot give the ICC authority to change a carrier's certificates in any way. Further, Greyhound makes the argument, relative solely to the through bus, that Section 216 (a) and (e) of the ICA, 49 U.S.C. § 316 (a) and (e), is the exclusive authority by which the ICC is empowered to order one carrier to operate a through bus with another.

In support of its argument under Section 212(a), Greyhound relies principally on United States v. Seatrain Lines, Inc., 329 U.S. 424, 432–433, 67 S.Ct. 435, 91 L.Ed. 396 (1947), and also cites Civil Aeronautics Board, Inc. v. Delta Air Lines, Inc., 367 U.S. 316, 81 S.Ct. 1611, 6 L.Ed.2d 869 (1961), Boulevard Transit Lines v. United States, 77 F.Supp. 594 (D.N.J.1948), and Watson Bros. Transportation Co. v. United States, 132 F. Supp. 905 (D.Neb.1955). Each case concerned the ICC's actual revision of a carrier's certificate without Section 212(a) procedure; none involved the reopening of an acquisition proceeding previously approved under Section 5(2).

The above cases and the argument derived from them are inapplicable here. The ICC was acting in response to Greyhound's failure to abide by representa-

tions made in acquisition proceedings. It was supplementing *orders* made in those proceedings, for good cause shown, and the supplemental order entered did not change the literal scope of Greyhound's certificates. Rather, the ICC was attaching conditions to its original orders which, as Greyhound concedes in its Brief, could have been attached to those orders in the first place. Only incidentally do the attached conditions affect the scope of Greyhound's certificates for the acquired routes, and only in one respect—the requirement that Greyhound reestablish the through bus with Mt. Hood under the old scheduling system abandoned in 1964. Other requirements, for example that Greyhound show Mt. Hood schedules in its folders, or that Greyhound agents voluntarily and accurately quote Mt. Hood joint through routes, do not even remotely affect the scope of the certificates issued to Greyhound. They relate to *destructive practices* independent of Greyhound's actual carrier operations which the ICC has found to be in violation of representations made in the earlier proceedings. It is our opinion that in no way can the action here be characterized as a partial revocation or suspension of Greyhound's certificates requiring the exclusive procedure of Section 212(a).

This position is supported by the few cases that have considered the scope of Section 5(9). The closest in point is Baggett Transportation v. United States, 206 F.Supp. 835 (N.D.Ala.1962), wherein a majority of a reviewing three-judge court upheld a similar supplemental order under Section 5(9),[5] duly noting the *Seatrain* and *Delta Air Lines* decisions. They reasoned that the rationale of both cases actually supported the ICC's action since the Supreme Court in both cases specifically recognized the difference between "order" and "certificate" in the statutory scheme of the ICA. 329 U.S. 432–433, 67 S.Ct. 435; 367 U.S. 327–328, n. 10, 81 S.Ct. 1611. The *Delta Air Lines* requirements of notice and hearing, as

here, had been met. *See also* City of New Orleans v. Texas & Pacific Ry. Co., 195 F.2d 887, 889 (5th Cir. 1952); Southern Pacific Co. v. United States, 277 F. Supp. 671 (D.Neb.1967), aff'd, 390 U.S. 744, 88 S.Ct. 1442, 20 L.Ed.2d 275 (1968); Penn-Central Merger and N & W Inclusion Cases, 389 U.S. 486, 522, 88 S.Ct. 602, 19 L.Ed.2d 723 (1968); Seaboard Coast Line Railroad Co. v. United States, 283 F.Supp. 866, 869 (E.D.Va. 1968).

■ The cases cited and the clear language of Section 5(9) are persuasive that Section 5(9) gives the ICC requisite power to support its action. If the section is to have any meaning at all, it is that Congress thereby empowered the ICC to review its acquisition orders and enter further orders for good cause shown, even if any such order incidentally affects a carrier's certificates. It is inconceivable to us that Congress intended that destructive practices made possible by acquisition approvals may not be corrected by supplemental order under Section 5(9), especially in light of the ICC's duty to take the antitrust policy of the United States into account in its decision making. *See* McLean Trucking Co. v. United States, 321 U.S. 67, 87, 64 S.Ct. 370, 88 L.Ed. 544 (1944). We do not mean to decide, however, that a direct and substantial revocation or change in a carrier's certificate may be ordered under Section 5(9) without satisfaction of Section 212(a) requirements. We hold only that, given the procedure followed here and the incidental effect on Greyhound's certificates the ICC had the power under Section 5(9) to enter its supplemental order.

■ Similar reasoning applies to the argument that Section 216(a) and (e) is the exclusive procedure by which the ICC may order the maintenance of a through bus. The ICC could have required this as a condition of its acquisition order under its Section 5(2) power, and indeed the discontinuance of a

---

5. Judge Rives concurred on the basis that Section 212(a) requirements had been met. He did not agree that Section 5(9) alone authorized the ICC's action.

through bus can, in circumstances such as those presented here, be a destructive practice designed to stifle a competitor. If representations are made inducing the ICC not to enter a through bus condition, Section 5(9) is a proper vehicle under which the ICC may deal with subsequent breaches of those representations, especially under the full procedural due process afforded here.

## II. *The Prior Acquisition Proceedings.*

■■ The second major argument of Greyhound is that the ICC's written orders in the acquisition cases appear to rest on independent grounds other than the representations which it now claims were violated, and therefore that the ICC cannot now rely on those representations to reopen the proceedings. In support, Greyhound has gone through each proceeding and order in detail, attempting to show lack of reliance on the part of the ICC. What representations were made, i. e., what actually was said during the proceedings, is undisputed. It is also undisputed that in each acquisition case under Section 5(2), the ICC has a duty to take into account the public interest and the competitive effects of the acquisition. *See* 49 U.S.C. § 5(2) (c); McLean Trucking Co. v. United States, 321 U.S. 67, 87, 64 S.Ct. 370 (1944). Thus even assuming the ICC failed to refer in its acquisition orders to all the representations at issue, this does not mean that the ICC has not relied on them or taken them into account. It had a duty to do so. Furthermore, to hold otherwise would require the ICC to anticipate all future breaches by an applicant and would bind it forever by the comprehensiveness of its acquisition order.

It is our opinion that Section 5(9) should not be so limited, and we cannot say that the ICC did not rely on representations honorably made in the prior proceedings. To do so, would be to give Greyhound, which dominates the industry, the ability to dictate how and in what way it would accede to ICC control. For us to bow to this would permit domination by Greyhound of the industry and the ICC.

## III. *Sufficiency of the Evidence.*

■ Greyhound's final argument goes to the sufficiency of the evidence in support of the ICC's findings. Our review of the evidence is a limited one. We are not authorized to overturn findings merely because we would have reached a different conclusion. Our function is to determine whether the findings are supported by substantial evidence. Administrative Procedure Act, 5 U.S.C. § 1009(e); Illinois Central Railroad v. Norfolk & Western Ry., 385 U.S. 57, 66, 87 S.Ct. 255, 17 L.Ed.2d 162 (1966); Consolo v. Federal Maritime Commission, 383 U.S. 607, 618–621, 86 S.Ct. 1018, 16 L.Ed.2d 131 (1966); Resort Bus Lines, Inc. v. Interstate Commerce Commission, 264 F.Supp. 742, 746 (S.D.N.Y.1967). There is no need here to recap the evidence as to each finding, some of which is set out in other parts of this opinion. We hold that the ICC's findings, both as to the characterization of statements that were made and as to practices held inconsistent with them, are amply supported by the evidence, and therefore clearly meet the "substantial evidence" standard.

## IV. *The Counterclaim*

■ A final consideration is the counterclaim. The ICC asks specific enforcement of its order in ten particulars which would require Greyhound (1) to show Mt. Hood schedules equally with others; (2) to restore the through bus and discontinue the Portland bus; (3) to revise connecting schedules to eliminate present delays on Mt. Hood's route; (4) to voluntarily and accurately quote joint through routes; (5) to cease quoting Mt. Hood's service unfavorably or inaccurately; (6) to show Mt. Hood connecting schedules equally with other competitors; (7) to permit Mt. Hood representatives to call on Greyhound agents; (8) to establish joint through fares with Mt. Hood; (9) to cease discriminating against Mt. Hood at depots

occupied by both carriers, and (10) to cease influencing joint commission agents for both Mt. Hood and Greyhound to favor Greyhound. Greyhound argues that not all the above are encompassed in the ICC's order, supra at 6–7, and therefore that this court is powerless to enjoin all practices listed in the counterclaim. The order here, however, in addition to proscribing three principal practices, proscribes all practices found by the examiner and Division Three to be unreasonable and inconsistent with prior representations. It is not essential to the enforcement of an agency order that each practice to be enjoined be set out specifically in the order, for we may refer to the record, the examiner's report, and the ICC's opinion to determine what the order was meant to include. Consolidated Flower Shipments, Inc. v. Civil Aeronautics Board, 213 F.2d 814, 818 (9th Cir. 1954); Las Vegas Hacienda, Inc. v. Civil Aeronautics Board, 298 F.2d 430, 439 (9th Cir. 1962); Brady Transfer & Storage Co. v. United States, 80 F.Supp. 110, 118 (S.D.Iowa, 1948), aff'd, 335 U.S. 875, 69 S.Ct. 239, 93 L.Ed. 418 (1948); Bingler Vacation Tours v. United States, 132 F.Supp. 793, 798 (D. N.J.1955), aff'd, 350 U.S. 921, 76 S.Ct. 211, 100 L.Ed. 806 (1955).

In effect then, destructive practices reflected in the record and opinions are a part of the order, and we have power specifically to enjoin them. Since we find that the record, the examiner's report, and the Division Three opinion, taken together, encompass all the practices we are requested to enjoin in the counterclaim, it will be granted in full.

It is therefore ordered that the motion of Greyhound Lines, Inc., and the Greyhound Corporation to set aside the order of the Interstate Commerce Commission be, and it is hereby denied, and that the order of the Commission be, and it is hereby affirmed.

It is further ordered that the counterclaim of the United States and the Interstate Commerce Commission be, and it is hereby granted as follows:

It is ordered that Greyhound Lines, Inc. and Greyhound Corporation restore practices and traffic patterns in existence or in contemplation as of July 30, 1952, in particular:

(1) that Greyhound show Mt. Hood schedules in Greyhound folders on an equal basis with other non-Greyhound lines;

(2) that Greyhound restore the through bus service which Greyhound operated until September 8, 1964, in connection with Mt. Hood via Klamath Falls and Biggs (The Dalles), Oregon, and discontinue the bus service Greyhound has operated in substitution therefor since then via Portland, Oregon;

(3) that Greyhound revise its interline schedules in connection with Mt. Hood so as to eliminate the presently existing delay of approximately three hours for passengers seeking to travel between California and Spokane via Mt. Hood's route and to negotiate in good faith with Mt. Hood on the establishment of bus schedules most advantageous to the traveling public;

(4) that Greyhound voluntarily and accurately quote joint through routes in connection with Mt. Hood, without geographical limitations in a manner fully responsive to inquiries from the traveling public;

(5) that Greyhound cease and desist from quoting Mt. Hood's service unfavorably or inaccurately in response to inquiries from the traveling public and from not quoting Mt. Hood's service at all in response to specific requests from the traveling public;

(6) that Greyhound show Mt. Hood's connecting routes on its maps on an equal basis with other non-Greyhound carriers;

(7) that Greyhound permit Mt. Hood's representatives to call on Greyhound's agents.

(8) that Greyhound establish joint through fares with Mt. Hood;

(9) that Greyhound cease and desist from discriminating against Mt. Hood at depots that Hood occupies with Greyhound; and

(10) that Greyhound cease and desist from influencing Commission agents selling both Greyhound and Mt. Hood tickets to favor Greyhound.